FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2010 JUN -8  PM 2: 16

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

LORE GREENFIELD and ALAN R. HIGGS,
individually and on behalf of all other similarly
situated,

                              Plaintiffs,

                v.

BP p.l.c.; BP AMERICA, INC.; BP
EXPLORATION & PRODUCTION, INC.;
ANTHONY B. HAYWARD; BRYON E. GROTE;
ANDY G. INGLIS; CARL-HENRIE SVANBERG;
PAUL M. ANDERSON; ANTONY BURGMANS;
CYNTHIA B. CARROLL; WILLIAM CASTELL;
H. LAMAR MCKAY; ERROLL B. DAVIS; and
TOM MCKILLOP,

                              Defendants.

CIVIL ACTION NO.

CLASS ACTION COMPLAINT

# 10-1683
## SECT. N MAG 5

       Plaintiffs, Lore Greenfield and Alan R. Higgs, individually and on behalf of all other

persons and entities similarly situated, by their undersigned attorneys, allege the following upon

personal knowledge as to themselves and their own acts, and upon information and belief as to

all other matters, based upon, *inter alia*, the investigation conducted by and through their

attorneys, which included, among other things, a review of the: (a) public statements made by the

defendants (described below in ¶ 37 [the "Defendants"]); (b) documents filed with the Securities

and Exchange Commission ("SEC") and the Mineral Management Service ("MMS"); (c)

Congressional testimony; (d) press releases and other media news reports; and (e) other publicly

available information regarding BP p.l.c. ("BP plc") and its subsidiaries and affiliates (hereafter

Fee 350
√ Process Calc (14)
X Dktd
___ CtRmDep
___ Doc. No.

collectively referred to as "BP"). Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and all others who purchased or otherwise acquired BP plc's ordinary shares (the "BP shares") and/or American Depository Receipts ("ADRs") from February 27, 2008 through May 12, 2010, inclusive (the "Class Period") to recover damages caused by Defendants' violation of the federal securities laws.

2.     Each ADR consists of six BP shares.

3.     This action involves investors who purchased BP shares and/or ADRs and were mislead by Defendants' representations regarding BP's commitment to safety and operational integrity, particularly with regard to deep water oil drilling.

4.     Through the Class Period, in SEC filings, MMS filings and other public statements, Defendants represented to the investing public that BP: (a) was conducting its oil exploration and production operations in the Gulf of Mexico (the "Gulf") in a safe and reliable manner; (b) had the technology to engage in deep water drilling operations; and (c) had the knowledge, procedures, measures and safeguards in place to deal with the known risks associated deep water drilling, including a plan to adequately respond to any spill that may occur.

5.     Notwithstanding the allegations set forth in this Complaint, Defendants were aware that BP's operations in the Gulf were inadequate and unsafe with respect to the risks associated with those operations, particularly with respect to an oil spill and its consequences.

## THE EXPLOSION ON AND THE SINKING OF THE DEEPWATER HORIZON RIG

6.      During the Class Period and several years prior thereto, BP leased the Deepwater Horizon rig (the "Rig") from Transocean Ltd. and/or one of its subsidiaries ("Transocean") to drill exploratory wells in the Gulf, including at the Macondo prospect site in Mississippi Canyon Block 252, located on the outer continental shelf off the coast of Louisiana.

7.      On April 20, 2010, the Rig was positioned about 50 miles southeast of Venice, Louisiana, in water nearly 5,000 feet deep.

8.      On April 20, 2010, drilling was being conducted on the Rig at over 22,000 feet, 2,000 feet deeper than allowed by federal permitting.

9.      On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil and/or natural gas erupted from the wellhead at the Macondo prospect, engulfing the Rig in fire and sinking it thirty-six hours later.

10.     The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil and natural gas leak (the "Leak") that has been spewing thousands of barrels of oil a day into the Gulf, which as of the date of the filing of this Complaint, extended over thousands of square miles of water, both on the surface and underneath it (the "BP Disaster").

11.     The Rig's blow-out preventer (the "BOP"), which was placed over the main wellhead on the sea floor and was the primary defense against a blowout, completely failed to cut off and close the drilling pipe at the wellhead, as it was supposed to do, and prevent the Leak.

12.     The BP Disaster has become the worst oil spill in United States history, which as of the date of the filing of this Complaint, has already polluted and threatens to pollute the waters, coastlines, wetlands and beaches of at least Louisiana, Mississippi, Alabama, and Florida.

## JURISDICTION AND VENUE

13.     The claims alleged in the Complaint arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j (b) and 78t (a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated by the SEC.

14.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

15.     This Court has personal jurisdiction over the Defendants because of BP's ties to - and impacts on - the United States including the following:

(a)     Approximately thirty-nine percent of BP plc's worldwide equity holders, such as the Plaintiffs, reside in the United States;

(b)     BP operates in  the United States through a number of subsidiaries and affiliates;

(c)     BP has approximately 22,800 employees in the United States, more than a quarter of its total worldwide employees and more than in any other country;

(d)     BP produces more crude oil in the United States than in any other country;

(e)     BP produces more natural gas in the United States than in any other country;

(f)     BP's capital expenditures in the United States are larger than in any other country, and BP has more operating capital deployed in the United States than in any other country;

(g)     BP's offshore drilling operations in the Gulf are subject to rules and regulations   promulgated by the United States;

(h)     BP holds at least one meeting of the Board (as defined below) per year in the United States; and

(i)     During the Class Period, BP's Board members have visited several of BP's facilities in the United States, including, but not limited to, the Thunder Horse rig in the Gulf, the Texas City refinery, and a gas production facility in Colorado.

16.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged in this Complaint occurred in this District.  BP conducts business in this District.

17.     In connection with the acts, transactions and conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

**PARTIES**

**A.  Plaintiffs**

18.     Plaintiff Lore Greenfield, a resident of the State of New York, purchased, as the Trustee of her IRA, ADRs as set forth in the Certification attached to this Complaint.

19.     Plaintiff Alan R. Higgs, a resident of the State of Connecticut, purchased, as the Trustee of his IRA, ADRs as set forth in the Certification attached to this Complaint.

**B.  Defendants**

20.     BP plc is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England.

21.     BP plc is one of the three largest integrated energy services companies in the world, with more than 80,000 employees and operations in more than 100 countries on six continents.  BP plc is the largest United States oil and gas producer.

22.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP plc, is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP America produces oil and natural gas in the United States.  It conducts substantial business in the State of Louisiana, including the operation of the Rig.

23.     Defendant BP Exploration & Production, Inc. ("BPX") is a Delaware corporation and wholly-owned subsidiary of BP plc. BPX has an office located in Houston, Texas and conducts business in the State of Louisiana. BP's filings with MMS were made by BPX.

24.     Defendant Anthony B. Hayward ("Hayward"), a citizen of the United Kingdom, is the Chief Executive Officer and a member of BP plc's Board of Directors (the "Board"). He has served as BP plc's Chief Executive Officer since 2007 and as an Executive Director of BP plc since 2003. Before becoming Chief Executive Officer, Hayward, who joined BP in 1982, served as the Chief Executive Officer of BP's exploration and production business segment ("Exploration and Production"), which oversees the exploration and drilling in the Gulf, from 2002 to 2007. Hayward is a member of BP's executive management, which is described on BP's website (http://www.bp.com/managedlistingsection.do?categoryId=9021802&contentId=7040609, last visited June 3, 2010), as being responsible for overseeing and running the day-to-day operations of BP. During the Class Period, Hayward participated in quarterly conference calls and in BP's strategic press conferences for 2008, 2009 and 2010.

25.     Defendant Byron E. Grote ("Grote"), a citizen of the United Kingdom, is Chief Financial Officer and a member of the Board. Grote joined BP in 1987. He was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002. He is employed at Exploration and Production. Grote is a member of BP's executive management, which is described on BP's website (http://www.bp.com/managedlistingsection.do?categoryId=9021802&contentId=7040609, last visited June 3, 2010), as being responsible for overseeing and running the day-to-day operations of BP. During the Class Period, Grote

participated in quarterly conference calls and in BP's strategic press conferences for 2008, 2009 and 2010.

26.     Defendant Andy G. Inglis ("Inglis"), a citizen of the United Kingdom, is an Executive Director and Chief Executive of Exploration and Production. He has worked for BP in various capacities since 1980 and has held his current positions since 2007. Inglis is a member of BP's executive management, which is described on BP's website (http://www.bp.com/managedlistingsection.do?categoryId=9021802&contentId=7040609, last visited June 3, 2010), as being responsible for overseeing and running the day-to-day operations of BP. During the Class Period, Inglis participated in quarterly conference calls and in BP's strategic press conferences for 2008, 2009 and 2010.

27.     Defendant Carl-Henrie Svanberg ("Svanberg"), a citizen of Sweden, is the Chairman of the Board since January 2010 and a member of the Board since September 2009. Svanberg participated in BP's strategic press conference for 2010.

28.     Defendant Paul M. Anderson ("Anderson"), a citizen of the State of Texas, is a member of the Board since February 2010. He is a member of the Safety, Ethics and Environment Assurance Committee of the Board ("SEEAC").

29.     Defendant Antony Burgmans ("Burgmans"), a citizen of the Netherlands, is a member of the Board since 2004. He is a member of SEEAC.

30.     Defendant Cynthia B. Carroll ("Carroll"), is a citizen of the State of Texas, is a member of the Board since 2007. She is a member of SEEAC.

31.     Defendant William M. Castell ("Castell"), a citizen of the United Kingdom, has been a member of the Board since 2006. Castell is the Chairman of SEEAC.

32.     Defendant H. Lamar McKay ("McKay"), a citizen of the State of Texas, is Chairman and President of BP America.  McKay is a member of BP's executive management, which is described on BP's website (http://www.bp.com/managedlistingsection. do?categoryId=9021802&contentId=7040609, last visited June 3, 2010), as being responsible for overseeing and running the day-to-day operations of BP. McKay testified before Congress with respect to the BP Disaster.

33.     Defendant Erroll B. Davis, Jr ("Davis"), a citizen of the State of Georgia, joined the Board in 1998. He is a member of SEEAC.

34.     Defendant Tom McKillop ("McKillop"), a citizen of the United Kingdom, was on the Board until April 2009.  He was also a member of SEEAC until April 2009.

35.     Anderson, Castell, Burgmans, Carrolls, Davis and McKillop are sometimes collectively referred to in this Complaint as the "SEEAC Defendants."

36.     The SEEAC Defendants and the defendants set forth in ¶¶ 24-25 and 27 are sometimes collectively referred to in this Complaint as the "Director Defendants".

37.     BP plc, BP America, BPX and the Director Defendants are sometimes collectively referred to in this Complaint as the "Defendants".

## C.  SEEAC

38.     According to BP plc's Form 20-F for the year ending 2009 filed on March 5, 2010 with the SEC (the "2009 20-F"), SEEAC is a Board committee that is responsible for ensuring that BP's safety protocols are implemented and followed.  The SEEAC is comprised of four non-executive directors.

39.     The following chart from the 2009 20-F depicts the responsibilities of SEEAC:



40.     According to the 2009 20-F,  in addition to its members, SEEAC invites the lead partner of BP's external auditors, the BP general auditor (head of internal audit) and the group head of safety and operations to attend each SEEAC meeting.  The SEEAC meetings are also attended by relevant senior executive managers.

41.     According to the 2009 20-F, Hayward was the principal executive liaison with SEEAC in 2009 and led the management reporting at all seven meetings of SEEAC, held that year.

42.     According to the 2009 20-F, Inglis, attended SEEAC meetings to report on topics specific to Exploration and Production businesses.

43.     According to the 2009 20-F, the main tasks and requirements for SEEAC are among others:

(a)     Monitoring and obtaining assurance on behalf of the Board that the management or mitigation of significant BP risks of a non-financial nature is appropriately addressed by the group chief executive;

(b)     Reviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication; and

(c)     Reviewing reports on the group's compliance with its code of conduct and on the employee concerns program as it relates to non-financial issues.

44.     According to the 2009 20-F, SEEAC receives information from external and internal sources, including directly from the business segments and supporting functions such as group compliance and ethics, safety and operations, and internal audit.

45.     According to the 2009 20-F, SEEAC participated in the Board's visit to the United States west coast fuels value chain in September which enabled members to discuss safety, operational integrity and environmental matters first hand at a marine terminal, a refinery, an inland distribution terminal and a retail site.

46.     The SEEAC Defendants are responsible for making both day-to-day and strategic decisions regarding safety for BP and for monitoring that those safety protocols and mechanisms were implemented.

## RELEVANT NON-PARTIES

47.     Transocean is a leading international provider of offshore contract drilling services for oil and gas wells.

48.     As of February 2, 2010, Transocean owned, had partial ownership interests in and/or operated 138 mobile offshore drilling units.  Transocean owned the Rig, which it leased to BP.

49.     Cameron International Corporation ("Cameron") is a leading provider of flow equipment products, systems and services to worldwide oil, gas and process industries.  Cameron manufactured the BOP on the Rig that failed to function correctly.

50.     Halliburton Energy Services, Inc. ("Halliburton") is a leading provider of oilfield technology, including fluid management and technologies to assist in the construction and

drilling of oil and gas wells.  Halliburton was a subcontractor to the Rig, providing services to cement the well head to the sea floor.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and/or entities that purchased BP shares and/or ADRs during the Class Period, excluding: (a) the Defendants; (b) any entity in which a Defendant has a controlling interest; (c) any parent, subsidiary, or affiliate (as defined by SEC Rule 12b-2) of BP plc;  (d) members of the Board during the Class Period: and (e) the legal representatives, heirs, predecessors, successors and assigns of the foregoing (the "Class").

52.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, the BP shares and ADRs were actively traded on the London Stock Exchange (the "LSE") and the New York Stock Exchange (the "NYSE"), respectively.

53.     While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class.

54.     Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

      (b)    whether Defendants issued false and misleading statements during the Class Period;

      (c)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)     whether the market prices of the BP shares and ADRs during the Class Period were artificially inflated as result of Defendants' misrepresentations and/or omissions;

(e)     whether the NYSE and the LSE are efficient markets such as to give rise to the presumption of reliance as set forth in *Basic v. Levinson*, 485 U.S. 224 (1988), and its progeny; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this Complaint.

56.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.

57.     Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable.

59.     Since the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.

60.     Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

## FACTUAL ALLEGATIONS

### A.   BP's Criminal Safety Lapses in the United States

61.   In 2005, an explosion and fire ripped through a tower at a BP refinery in Texas City, Texas, killing 15 people, injuring 170 others, and costing BP over $1 billion to remediate (the "Texas City Incident").

62.   With regard to the Texas City Incident, investigators determined that BP had ignored its own protocols on operating the tower, which was filled with gasoline, and that a warning system had been disabled.

63.   With regard to the Texas City Incident, BP pled guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency (the "EPA").

64.   With regard to the Texas City Incident, BP signed a plea agreement with the federal government vowing to institute improvements, such as to develop and implement a process safety management program, conduct independent audits over the process safety management program, and conduct safety and health training.

65.   In 2009, the Occupational Safety and Health Administration (the "OSHA") imposed an $87 million fine - the largest in its history - on BP for failing to correct the safety violations at the Texas City plant.  OSHA declared that BP had a "serious systematic safety problem" across the company.

66.   In 2006, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline (the "Prudhoe Bay Incident").  BP had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was corroded.

67.     With regard to the Prudhoe Bay Incident, BP was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines.

68.     A Congressional committee determined that BP had ignored opportunities to prevent the Prudhoe Bay spill and that "draconian" cost-saving measures had led to shortcuts in BP's operations.

69.     With regard to the Prudhoe Bay Incident, BP signed a criminal plea agreement with the federal government vowing to institute improvements, such as implementation and operation of an integrity management program and of a more effective leak detection system.

70.     The failures at all levels of BP leading to the Texas City Incident and the Prudhoe Bay Incident, together with other improprieties, were the specific subject of a shareholder derivative lawsuit brought against the Board and various officers in 2006, including Hayward, Grote, Burgmans, Castell, Davis and McKillop. *See In re BP P.L.C. Derivative Litigation*, No. 3AN-06-11929CI (Alaska Super. Ct. filed Oct. 5, 2006) (the "Alaska Derivative Action").

71.     In the Alaska Derivative Action, plaintiff alleged that the defendants there (the "Alaska Defendants") had breached their fiduciary duties to BP by, among other things, causing BP to violate the laws of the United States (and several other states) relating to environmental regulation and worker and workplace safety.

72.     The Alaska Derivative Action further alleged that the Alaska Defendants resorted to improper and illegal activities to cut costs and temporarily boost BP plc's reported results, including refusing to make expenditures for necessary plant and equipment inspections, worker training, emergency response plans and procedures, and the maintenance and replacement of equipment, which conduct led inevitably to both the 2005 Texas City Incident and the 2006 Prudhoe Bay Incident.

73.     The settlement agreement ultimately entered into by the parties in the Alaska Derivative Action (the "Derivative Action Settlement Agreement"), and approved by the Alaska court, required certain corporate governance changes at BP designed in part to prevent a recurrence of the disregard of safety and maintenance problems at BP.

74.     Changes required by the Derivative Action Settlement included making safety and environmental performance a component in determining executive compensation and requiring non-executive Board members to participate in a program of visits to the BP's operating sites to assist in their understanding of the importance of safety and environmental concerns.

75.     While purporting to implement the relevant reforms in the Derivative Action Settlement Agreement, Defendants have merely gone through the motions, while ignoring its substance and import.

76.     As confirmed by the BP Disaster, BP has not attained improvement in its workplace and environmental safety and still suffers from the same shoddy level of investment and resources in equipment maintenance and inspections, worker training, emergency response plans and procedures, and compliance with law.

B.   **BP's False Public Image of the Safety of its Operations**

77.     When Hayward took over BP in 2007 after the Texas City Incident and the Prudhoe Bay Incident, he and BP launched a campaign to convince the market for BP plc securities that it had changed its ways and was conducting its operations in a safe and reliable manner.

78.     Hayward promised to change BP's culture, with a renewed commitment to safety. During a press conference on February 6, 2007, Hayward represented that his first priority as CEO was "focusing like a laser on safe and reliable operations."

79.     In SEC filings, MMS filings, and public presentations and speeches, Defendants touted new areas of oil exploration and production, such as the deep water of the Gulf, and BP's ability to extract and produce that oil in an environmentally friendly and safe manner that posed little risk to the environment, the company and its shareholders.

80.     In the 2009 Howard Weil Conference, an annual energy industry conference, McKay commented about BP's technological advances in offshore drilling in the Gulf and the safety of BP's operations.  McKay stated:

> There's no better example of what technology can do than the deep waters of the Gulf of Mexico....
>
> By the way, let me add that **managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant** in the years ahead...
>
> **Safety will continue to have first call on the company resources...**

(http://www.bp.com/genericarticle.do?categoryId=98&contentId=7058050, last visited     June 3, 2010)(Emphasis added)

81.     During a hearing of the Senate Energy and Natural Resources Committee ("SENRC") held in November 19, 2009, BP America's Vice President, Gulf of Mexico Exploration, David Rainey ("Rainey"), testified that BP's had technological safeguards in its Gulf operations to protect the environment and prevent any oil spill.

82.     Despite the attempt to change BP's image and portray BP's operations as safe, Defendants recklessly let the crucial values of maintenance and safety fall by the wayside.

83.     According to a *ProPublica* article posted on MSNBC.com on May 25, 2010, in representations to EPA, BP "has been insisting that it had made far-reaching changes in its approach to safety and maintenance."

84.     As shown by the facts alleged in this Complaint, the record shows that BP's representations regarding "far-reaching changes in its approach to safety and maintenance" were grossly overstated.

85.     Hayward and the other Defendants have led BP on an expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures in disregard of safety and environmental concerns.

86.     BP's failure to properly maintain, inspect and use its equipment, and to employ adequate safety mechanisms, technologies and precautions, in its offshore drilling projects, including the Rig, in the Gulf and elsewhere, is in keeping with its abominable safety record as a whole.

87.     Well before the BP Disaster, BP concealed the fact that its engineers had predicted a catastrophic disaster.  In an August 15, 2008 e-mail, a BP project manager stated that on the BP deep water rig Atlantis (the "Atlantis"), also drilling in the Gulf, "[t]he current procedures are out of date."  The project manager warned that the lack of proper documentation "*could lead to catastrophic operator errors due to their assuming the drawing is correct.*" (Emphasis added)

88.     Ken Abbott ("Abbott"), a BP consultant hired to give advice on operation of the Atlantis, told BP that critical blueprints and drawings needed to safely operate the Atlantis had not been reviewed or approved by BP engineers.  According to him, 89% to 95% of the blueprints that were critical to BP's operation of the Atlantis had never been reviewed or approved.

89.     When Abbott raised the issue of safety with seniors BP manager, he was criticized, isolated and later dismissed by BP.

90.    An independent firm hired by BP in 2009 to investigate a whistle-blower's complaint about the Atlantis found that BP was violating federal policies by not having completed engineering documents on board of the Atlantis when it began operating in 2007.

91.    None of these warnings within BP about the safe operation of its deep water drilling rigs in the Gulf were disclosed to the investing public.

92.    BP has actively opposed MMS rules requiring oil rig lessees and operators to develop adequate safety and maintenance procedures.  For example, in 2009, when the MMS proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years, BP lodged a formal objection stating that voluntary compliance would suffice.

93.    In 2009, the Defendants caused BP to spend millions of dollars lobbying the federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and BP's knowledge of the high risks involved in such drilling.

94.    BP's stance has had predictable consequences in its appalling safety record in 2009 alone.  In the months before the BP Disaster, BP had four close calls on pipelines and facilities it operates in Alaska, as detailed in a January 14, 2010, letter written by two United States Congressmen, Rep. Bart Stupak ("Stupak") and Rep. Henry Waxman ("Waxman") to the president of BP's Alaskan operations.  These congressmen's letter specifically noted that BP's efforts to cut costs could imperil safety at BP facilities.

95.    Prior to the BP Disaster, BP had repeatedly and aggressively cut costs, by stripping 5,000 jobs from its payroll and saving BP more than $4 billion in operating costs.

96.     Even in the aftermath of the BP Disaster, BP has publicly stated that its other operations remain safe and that the BP Disaster was merely an isolated incident.

97.     From the evidence revealed to date, BP's push for speed over safety was the primary cause of the BP Disaster.

### C.     BP's Prior Disregard of Well-Known Risks in Offshore Drilling

98.     The risks of deep water offshore drilling were well known to the Defendants, and are especially high in the Gulf, where floating rigs are usually used.

99.     In its Form 20-F filed with the SEC for the year ending December 31, 2007 (the "2007 20-F"), BP recognized "the significant safety, cost and environmental implications of conducting" deep water drilling in the Gulf.  (2007 20-F at p. 15)

100.    The threat of blowouts, as happened with the Rig, increases as drilling depth increases.

101.    The Rig was drilling in 5,000 feet of water and to a total depth in excess of 20,000 feet.  The Defendants were aware of the high risk of blowouts from such deep drilling.

102.    BP had extensive knowledge of the potential for disaster caused by inadequate inspection and maintenance of its equipment used in deep water offshore drilling from prior experience with its own drilling rigs, including the Rig.

103.    In 2005, according to a Wall Street Journal article dated May 18, 2010 BP's Thunder Horse rig off the Louisiana coast had a near disaster when a faulty control system opened valves and allowed water to flood into the hull of a drilling platform.  The platform almost sank.

104.    On February 12, 2006, according to a MMS Accident Investigation Report, the Discoverer Enterprise, which also was being leased by BP and operated by Transocean, was

drilling a well in over 6,000 feet of water when a leak of hydraulic fluid from the BOP was discovered. Investigators found that debris had gotten into the BOP and reduced its effectiveness because in part of "extended use of [BOP] without inspection/maintenance."

105.   In 2007, according to MMS website, BP was cited for inadequately training employees in well control in a scenario that was very similar to the BP Disaster. (*See* http://www.mms.gov/civilpenalties/CP_2007.HTM, last visited on June 3, 2010)

106.   According to a July 15, 2008 MMS Accident Investigation Report, an incident occurred on the Rig on May 26 2008 where 77 persons were evacuated after it listed over and began to sink after a section of pipe was accidentally removed from the Rig's ballast system.

107.   The Defendants knew of an August 2009 blowout in a rig in the Timor Sea, which was found to have been caused by careless cementing work, one of the possible causes of the BP Disaster. During that incident, which bears a strong resemblance to the BP Disaster, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

### 1.   BP's Disregard of Safety Concerns Over BOPs

108.   For years before the BP Disaster, Defendants were aware that the Rig's BOP made by Cameron might not adequately function in a deep water environment.

109.   A BOP manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000.

110.   In that incident, BP issued a notice of default to Transocean concerning the functioning of the BOP on one of Transocean's oil rigs being leased by BP. Hayward acknowledged the existence of this dispute in public comments on May 4, 2010. Yet as BP was aware, another Cameron BOP was being installed on the Rig around the same time in 2000.

111.    In September 2004, an independent study and report entitled "Shear Ram Capabilities Study," commissioned by the MMS, discussed the reliability of BOPs in deep water and concluded that a BOP may not function in deep water drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such depths. The report also criticized Cameron for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at a greater depth.

112.    Despite its knowledge of the greater danger of blowouts occurring in deep water drilling wells, BP's employees working on the Rig failed to properly inspect, maintain and test for the proper functioning of the BOP above the wellhead to which the Rig was attached.

113.    In 2006, as reported by the Wall Street Journal in an article dated May 10, 2010, MMS concluded that BOPs in Transocean-constructed rigs frequently failed because of maintenance issues.

114.    As reported by the Wall Street Journal in an article dated May 18, 2010, a 2007 paper, co-authored by a BP employee, was presented at a Society of Petrochemical Engineers ("SPE") conference and later published in SPE's journal. It stated, "The use of higher strength, higher toughness drill pipe ... has in some cases exceeded the capacity of some BOP shear rams to successfully and reliably shear drill pipe."

115.    Even after a 2000 MMS safety alert that urged deep water drill operators in the Gulf to have backup methods for activating a BOP, BP elected not to have installed an acoustically-activated remote-control shut-off valve, costing only approximately $500,000, to the well. By contrast, the replacement cost of the entire Rig is approximately $560 million.

116.   Additionally, BP failed to have installed any back-up safety mechanisms and equipment that were readily available and regularly used on other deep water rigs around the world that would have prevented the Leak even without the BOP.

117.   Defendants chose not to have installed on the Rig a deep-water valve to cut off the drilling pipe below the sea floor.  This valve could have served as a back-up system in the event the BOP failed to work.

118.   In March 2010, when the Rig was having well control problems, according to a New York Times article on May 29, 2010 relying on internal BPX emails, the Rig's records showed that the BOP was leaking fluid, which the BOP manufacturer, Cameron, had warned limited its ability to function properly.

119.   According to the same article referred to in the preceding paragraph, BP subsequently requested and received permission from MMS to delay further testing of the BOP and thereafter to test it at a significantly lower pressure than normally required by regulations and accepted industry standards in the days leading up to the BP Disaster.

### 2.   BP's Disregard of the Dangers of Casing and Cementing the Well

120.   At the time of BP Disaster, BP employees were supervising and controlling the cementing of the well, which was being performed by Halliburton.

121.   As Defendants were aware, cementing of a wellhead, particularly in deepwater, is crucial and precise work that carries a high risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well.

122.   In the summer of 2007, an MMS study raised concerns about oil rig blowouts associated with the exact type of cementing work being used on the Rig when it exploded.  It noted that blowouts during cementing work were occurring with regularity, and cementing was a

factor in 18 of 39 well blowouts between 1992 and 2006.   Nearly all of the blowouts examined occurred in the Gulf.

123.   On June 22, 2009, according to the May 29, 2010 New York Times article (referred to in ¶¶ 118-119 above) BP engineers expressed concerns internally that the casing used for the drilling well on the Rig might collapse under the high pressures of the deep water. Special permission within BP had to be obtained because use of that specific well casing was contrary to BP's design standards, and BP senior officials were aware of this exceptional use.

124.   In the month before the BP Disaster, according to the same article referred to in the preceding paragraph, BP engineers initially concluded that cementing of the casing used for the well was "unlikely to be a successful cement job," and did not meet MMS regulations.

125.   As discussed in ¶¶ 50 and 120 above, Halliburton was responsible for cementing a well off in the Timor Sea that blew in August 2009.   It is believed a poor cement job likely caused that blowout.

126.   According to Associated Press report on May 26, 2010, based on witness statements obtained by the Associated Press, BP was "taking shortcuts" the day of the explosion on the Rig by replacing heavy drilling fluid with saltwater in the well during the cementing process.

127.   The Associated Press also reported that Truitt Crawford, roustabout employed by Transocean, stated that with respect to the allegations in the preceding paragraph, "I overhead upper management talking saying that BP was taking shortcuts by displacing the well with saltwater instead of mud sealing the well with cement plugs, this is why it blew out."

**D. Defendants' Admissions after the BP Disaster**

128.    While BP struggled to stop the Leak, on May 10, 2010, BP's Chief Operating Office, Doug Suttles ("Suttles") admitted that BP was unprepared to mitigate the damage of the BP Disaster. He stated, "there's a lot of techniques available to us. The challenge with all of them is,…, they haven't been done in 5,000 feet of water."

129.    On May12, 2010, the end of the Class Period, Hayward admitted that BP did "not have the technology available to stop the leak" and said in hindsight "it was 'probably true' that BP should have done more to prepare for an emergency of this kind."

130.    As reported in the Financial Times  on June 3, 2010, Hayward in response to questions from reporter Ed Crooks stated:

> BP was looking for new ways to manage 'low-probability, high-impact' risks such as the Deepwater Horizon oil rig accident…..
>
> What is undoubtedly true is that we did not have the tools you would want in your tool-kit…[BP] had not been fully prepared for a deep-water oil leak.

131.    Although liability under federal law is capped under the Oil Pollution Act of 1990 at $75 million, Hayward - in an implicit admission of liability - announced that BP would voluntarily pay in excess of the liability cap imposed by the Act to remediate the problem.

## BP's MISPRESENTATIONS AND OMISSIONS DURING THE CLASS PERIOD

132.    Beginning no later than February 27, 2008, BP began to highlight its operations in the Gulf as one of its primary economic drivers and that it had the technology to conduct such operations in a safe manner.

133.    At the same time, BP failed to disclose that its Gulf operations were risky and lacked safety procedures and technology to deal with a major oil spill.

**A.  2008 BP Strategy Presentation**

134.    On February 27, 2008, during the 2008 BP Strategy Presentation ("2008 Strategy"), Hayward stated that:

> 2007 saw further improvement in our overall safety performance. Over the last eight years our safety performance measured by Recordable Injury Frequency Rate – the standard measure of safety in our industry has improved three-fold. As you can see on this chart our performance is amongst the best in our industry.
>
> Notwithstanding this track record our intense focus on process safety continues. …
>
> *Safe and reliable operations remain our number one priority.* (Emphasis added)

135.    Inglis in the 2008 Strategy, while touting the growth in the Gulf, said that "Our priority continues to be the safety and reliability of our operations."

136.    At the end of the 2008 Strategy, Hayward again reiterated that BP priorities are "safety, people and performance."  He stated that BP is "determined to operate safely and reliably…rigorously reducing complexity and cost."

137.    The statements set forth in ¶¶ 134-136 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and

maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

**B.   2008 Form 20-F Annual Report**

138.   On March 4, 2009, BP filed with the SEC its Form 20-F for the year ending December 31, 2008 (the "2008 20-F"), which included the following representations on safety and risk management:

> *Throughout 2008, senior leadership across the group continued to hold safety as their highest priority*. Site visits, in which safety was a focus, were undertaken by the group chief executive (GCE) and members of the executive team to reinforce the importance of their commitment to safe and reliable operations.
>
> \* \* \* \* \*
>
> We continue to implement our new operating management system (OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site...The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis....
>
> \* \* \* \* \*
>
> *We remain fully committed to becoming a recognized industry leader in process safety management and are working to achieve this*. (Emphasis added)

139.   The statements set forth in ¶ 138 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease

restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

## C.  BP's Code of Conduct

140.    BP's Code of Conduct, which is available on its website, in a section entitled, "Health, safety, security and the environment" ("HSSE") states:

> At BP our aspirations are - **no accidents, no harm to people and no damage to the environment.**

> We are committed to the protection of the natural environment, to the safety of the communities in which we operate, and to the health, safety and security of our people.

> Everyone who works for BP, everywhere, has a responsibility for getting HSSE right. (Emphasis added)

141.    The statements set forth in ¶ 140 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance

across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

**D.   March 10, 2009 Initial Exploration Plan**

142.   On March 10, 2009, BP filed an Initial Exploration Plan for Mississippi Canyon 252 (the "Exploration Plan"), which details the safety mechanisms that BP said it intended to implement.  The document was dated as being received by the MMS on February 23, 2009.

143.   The Exploration Plan did not contain a blowout plan (i.e., a plan for handling a spill from an uncontrolled blowout) or a site-specific oil spill response plan.

144.   This Exploration Plan was materially false and misleading because it failed to disclose that BP: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127.

**E.   2009 BP Strategy Presentation**

145.   On March 3, 2009, during the 2009 BP Strategy Presentation (the "2009 Strategy"), Hayward stated that:

> 2008 was another year of progress on our number one priority of safe and reliable operations….[t]he number of major incidents involving integrity failures has continued to decrease, and our track record continues to improve…
>
> We remain focused on process safety and asset reliability.  We have begun the implementation of our Operating Management System…

146.   While reiterating that "safe and reliable operations come first," Inglis indicated that in exploration and drilling operations, BP has delivered a 15% efficiency improvement or

$500 million in savings because BP is applying a common approach everywhere it drills and setting technical limits for the activity.

147.    The statements set forth in ¶¶ 145-146 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

F.    **Howard Weil Conference on March 25, 2009**

148.    Plaintiffs reallege the allegations set forth in ¶ 80 above.

149.    As referenced above in ¶ 80 and 148, on March 25, 2009, McKay gave a speech in the Howard Weil Conference.  In his speech, he commented about growth of offshore drilling in the Gulf.

150.    The statements set forth in ¶¶ 80 and 148-149 were materially false and misleading because McKay failed to disclose that Defendants had not taken the necessary steps to avoid the BP Disaster, including: ((a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to

properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig,

as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ

adequate safety mechanisms, technologies and precautions in the offshore drilling projects,

including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing

MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93;

(e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93;

(f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its

approach to safety and maintenance across all its operations, including offshore drilling and the

Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

### G.   Sustainability Review 2008

151.   On April 1, 2009, BP issued its Sustainability Review 2008 (the "2008 Review").

In the 2008 Review, Hayward mentioned its "top three priorities as chief executive: safety,

people and performance." (*2008 Review* at p.2)   Hayward also mentioned that:

> Safe and reliable operations are BP's number one priority and we have taken a
> series of actions to improve performance.   The short-term programme has
> included improving processes to assess risks of major accidents and new
> standards for control of work and integrity management.   For the longer term, we
> have introduced the OMS to improve the management of safety risks and the
> quality of performance in our worldwide operations...I'm encouraged by the
> overall improvement in our safety performance in 2008....and recognize we still
> have a lot to do.

(*Id.* at p. 3)

152.   In the 2008 Review, BP indicated that its commitment to safety comes "from the

top" and that it was "committed to becoming a recognized industry leader in process safety

management." (*Id.* at p. 8-9)

153.   The statements set forth in ¶¶ 151-152 were materially false and misleading

because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a)

failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

**H. November 19, 2009: BP's Statements to the SENRC**

154.    On November 19, 2009, the SENRC held a hearing to discuss the environmental impact of offshore oil and gas production in the Gulf.  Among the items discussed at the hearing were technological advances in oil drilling and safety concerns.

155.    Rainey appeared before the SENRC and stated that advances in technology had enabled the industry to reduce the occurrence of oil spills and other environmental consequences of offshore drilling. He stated that BP has been at the "forefront of both the development of the technologies and their application" Rainey listed the technologies used to BP to conduct exploration and drilling in the Gulf and how those technologies reduce the environmental impact.

156.    Specifically, Rainey testified:

I think we should remember that scientific knowledge is always moving forward. And actually using the best available and the most up-to-date scientific information is part of the current regulatory system. And it supports the OCS leasing, exploration, and development program. And I think we need to remember that OCS has been going on for the last 50 years, and *it has been going on in a way that is both safe and protective of the environment.* (Emphasis added)

157.   In addition, Rainey provided a written statement prior to that hearing which included the following statements regarding BP's technological safeguards in the Gulf to protect the environment and prevent an oil spill:

Any release of hydrocarbons from our operations into the environment is unacceptable, and we continue to invest in research and technology to drive us to our ultimate goal of zero discharge.

Examples of the technologies which have helped to reduce accidental releases include:

- Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected;
- Blowout preventer technology which includes redundant systems and controls;
- New and improved well control techniques which maintain constant control of the fluids in the wellbore;
- Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures; and
- BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston.

....All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.

158.   The statements set forth in ¶¶ 81 and 155-157 were materially false and misleading because Rainey failed to disclose that Defendants had not taken the necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set

forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ

adequate safety mechanisms, technologies and precautions in the offshore drilling projects,

including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127.

I.   **2009 Annual Review**

159.   On February 26, 2010, BP issued its 2009 Annual Review (the "2009 Review").

The 2009 Review included a letter from Svanberg, stating:

> Risk remains a key issue for every business, but at BP is fundamental to what we
> do.  We operate at the frontiers of the energy industry, in an environment where
> attitude to risk is key…the *[B]oard will strive to set high expectations of how
> risk is managed and remain vigilant on oversight*. (Emphasis added)

160.   In the 2009 Review, Hayward indicated that despite difficult market conditions,

BP delivered strong operating financial results while still focusing on "safety and reliable

operations."

161.   In the 2009 Review, Hayward also acknowledged that BP was operating on the

frontiers of the energy industry and was the largest producer and leaseholder in the deep water of

the Gulf.   He assured investors that risks were being handled appropriately, because "we

continue to show our ability to take on and manage risk, doing the difficult thing that others

either can't do or chose not to do."

162.   In a section of the 2009 Review entitled "Sustaining momentum and growth," BP

acknowledged that its safety protocols are material to investors by including a separate section

on safety.

163.   In the 2009 Review, Inglis claimed that safety was Exploration and Production's

primary focus: "Safety, both personal and process, remains our highest priority."  He indicated

that there were significant improvements in the number of process safety-related incidents and a

reduction in the number of spills.

164.    The statements set forth in ¶¶ 159-163 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

**J.    2010 BP Strategy Presentation**

165.    On March 2, 2010, BP made its 2010 strategy presentation ("2010 Strategy Presentation") which highlighted its deep water operations, especially its operations in the Gulf. The presentation indicated that the largest area of growth for BP from 2010 through 2015 is the Gulf.

166.    In the 2010 Strategy Presentation, BP again reiterated that "Safe and reliable operations remains #1."

167.    The statements set forth in ¶¶ 165-166 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a) failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-

104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig as set forth in ¶¶ 65, 87-90, 94 and 105.

### K.  2009 Form 20-F Annual Report

168.   In a section entitled "Outlook" in the 2009 20-F, BP stated:

Our priorities remain the same- *safety, people and performance*, focusing on the delivery of safe reliable and efficient operations.  In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, *while ensuring we maintain our priorities of safe, reliable and efficient operations*. (Emphasis added)

169.   In the 2009 20-F, BP stated that:

Safety, people and performance are BP's top priorities. We constantly seek to improve our safety performance through the procedures, processes and training program[s] that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment.'

170.   In the 2009 20-F, while addressing its oil exploration and production operations, including highlighting its deep water Gulf operations, BP stated that, "In Exploration and Production, safety, both personal and process, remains our highest priority." (Emphasis added)

171.   The statements set forth in ¶¶ 168-170 were materially false and misleading because Defendants had failed to take necessary steps to avoid the BP Disaster, including: (a)

failing to address known risks associated with deep water drilling as set forth in ¶¶ 87-90, 100-104, 106-111, 113-115, and 121-125 ; (b) failure to properly maintain, inspect, and use its equipment in offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (c) failure to properly employ adequate safety mechanisms, technologies and precautions in the offshore drilling projects, including the Rig, as set forth in ¶¶ 87-90, 102-106, 108-119, 123-124 and 126-127; (d) opposing MMS rules requiring BP to develop adequate maintenance procedures as set forth in ¶¶ 92-93; (e) lobbying the federal government to ease restrictions on offshore drilling as set forth in ¶ 93; (f) implementing severe cost cutting measures as set forth in ¶ 95; and (g) failing to change its approach to safety and maintenance across all its operations, including offshore drilling and the Rig, as set forth in ¶¶ 65, 87-90, 94 and 105.

## FRAUD ON THE MARKET

172.   At all relevant times, the market for BP shares and ADRs was an efficient market for the following reasons, among others:

(a)   BP shares and ADRs met the requirements for listing, and were listed and actively traded on the LSE and NYSE, both highly efficient markets;

(b)   On average BP shares and ADRs traded millions of shares and receipts per day during the Class Period;

(c)   As a regulated issuer, BP filed periodic public reports with the SEC;

(d)   BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)   BP plc was followed by securities analysts and many brokerage firms who issued reports which were distributed to the financial community. Each of these reports was publicly available and entered the public marketplace.

173.    As a result of the foregoing, the market for BP shares and ADRs promptly digested current information from all publicly available sources and reflected such information in the price of BP shares and ADRs.

174.    The price of BP shares and ADRs moved in direct response to information regarding BP that was put out in the public market place.  For example, the price of BP shares and ADRs dropped significantly after the BP Disaster.

175.    Under these circumstances, all purchasers of BP shares and ADRs during the Class Period suffered similar injury through their purchase of those securities at artificially inflated prices, and a presumption of reliance applies.

## SCIENTER

176.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

177.    Defendants' material representations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing Defendants' operations and business affairs from the public, thereby supporting the artificially inflated price of BP shares and ADRs.

178.    As demonstrated by Defendants' statements throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged, Defendants were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discovery whether those statements were false or misleading.

179. The facts alleged in this Complaint compel a strong inference that the Defendants acted with scienter in their failure to disclose and misrepresentation of material information to the investing public concerning BP's commitment to safety and operational integrity, especially as related to deep water drilling operations. Defendants knowingly and substantially participated or acquiesced in the suppression and misrepresentation of such information as primary violators of the federal securities laws.

180. In particular, Defendants' knowledge that BP was conducting its operation in an unsafe manner is demonstrated by the following:

- Internal communication by project managers to senior staff in BP that, in the Gulf, project managers and engineers were submitting out-dated information that violated BP's Code of Conduct and created a serious risk of catastrophic disaster. (¶¶ 87-90, 118-119, 123-124 and 126-127)

- In the months leading up to the BP Disaster, BP not only knew about problems at the Rig, but BP senior managers gave orders that put profit and speed before safety. Those cut-costing measures were one of the causes leading to the BP Disaster. (¶¶ 118-119, 123-124 and 126-127)

- A 2000 MMS safety alert stated that all oil rigs operating in the Gulf, such as the Rig, should include backup BOP. BP senior management knew none has been installed on the Rig. (¶ 115)

- A 2004 MSS study showed that BOPs may not function in deep water drilling environments. (¶ 111)

- BP knew that BOPs manufactured by Cameron and used in Transocean rigs may not adequately function in deep water environment. In fact, in 2000, BP issued a notice of default to Transocean concerning the malfunction of a BOP in another rig. (¶¶ 108-113, and 117)

- In 2006, MMS concluded that BOPs in Transocean constructed rigs frequently failed because of maintenance issues. (¶ 113)

- BP senior management elected not to install an acoustically activated remote control-shut-off valve on the Rig, even though such devices are installed in other rigs it operates around the world. Such device may have prevented the BP disaster. (¶¶ 116-117)

- In the last five years, BP has had near disaster in rigs that it operates in the Gulf

that have resulted from poor and/or inadequate maintenance. (¶¶ 103-104 and 106)

- BP was aware that cementing a wellhead in deep water carries greater risk of blowout; yet BP took "short-cuts" to reduce costs and speed up the work, while ignoring safety concerns. (¶¶ 120-127)

- A January 14, 2010 letter from Representatives Stupak and Waxman raised serious concerns about the safety of BP's operations in Alaska, after four incidents. The letter noted that BP's efforts to cut cost could imperil safety at BP's facilities. (¶ 94)

## LOSS CAUSATION

181.   During the Class Period, the prices of BP shares and ADRs were artificially inflated as a result of Defendants' omissions of material fact and materially false and misleading statements.

182.   When the falsity of the materially false and misleading statements was revealed, and the material omissions disclosed, the prices of BP shares and ADRs fell precipitously as the prior artificial inflation was promptly and completely eliminated from the price of those securities.

183.   Plaintiffs and the Class incurred an economic loss (damages under the securities laws) as a result of Defendants' material omissions and materially false and misleading statements.

184.   The following chart graphs the price of ADRs during the Class Period:



**BP p.l.c.**
**ADRs prices during the Class Period**

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

185.   The statutory safe harbor provided by forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

186.   The statements alleged to be false and misleading in this Complaint relate to then-existing facts and conditions.

187.   To the extent that any of the statements alleged to be false and misleading may be deemed to be forward looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements, or even if so identified, the statements were material.  They were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

188.    At the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer or director of BP who knew that the statement was false when made.

189.    To the extent that any of the statements set for above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## GROUP PLEADING ALLEGATIONS

190.    It is appropriate to treat the Director Defendants and BP as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the BP public filings, MMS filings, press releases and other publications are the collective actions of the Director Defendants and BP.

## COUNT I

### For Violations of § 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

191.    Plaintiffs incorporate all of the allegations in ¶¶ 1-190 above.

192.    During the Class Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other Class members, as alleged herein and caused Plaintiffs and other Class members to purchase BP shares and/or ADRs at inflated prices that they would not have paid had they known of the improper conduct alleged in this Complaint.

193.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as fraud and deceit upon the purchase of BP shares and ADRs, including Plaintiffs and the Class members, by making false and misleading statements and omitting material facts regarding BP's risk management and safety practices. This was done in an effort to artificially inflate BP shares and ADRs value in violation of § 10(b) of the Exchange Act and Rule 10b-5.

194.    All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme alleged herein.

195.    BP plc' statements set forth in ¶¶ 80-81, 134-136, 138, 140, 142-143, 145-146, 148-149, 151-152, 154-157, 159-163, 165-166 and 168-170 were false and misleading.

196.    Hayward's statements set forth in ¶¶ 134, 136, 145, 151 and 160-161 were false and misleading.

197.    Inglis's statements set forth in ¶¶ 135, 146 and163 were false and misleading.

198.    McKay's statements set forth in ¶¶ 80 and 149 were false and misleading.

199.    Rainey's statements set forth in ¶¶ 154-157 were false and misleading.

200.    Svanberg's statements set forth in ¶ 159 were false and misleading.

201.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to make affirmative misrepresentations an conceal adverse material information about BP's risk management and safety procedures of its oil exploration and production operations, including those that related to offshore deep water drilling and the BP Disaster.

202.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Defendants'
material misrepresentations and/or omissions were done knowingly or recklessly and for the
purpose and effect of inflating the market price of BP shares and ADRs.  Specifically:

(a)     Hayward had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth
because as set forth in ¶¶ 24, 38-41 and 70-73, he (i) was Chief Executive
Officer of Exploration and Production, which oversees drilling at the Gulf,
(ii) was involved in the Alaska Derivative Action, (iii) is the Chief
Executive Officer of BP plc, (iv) is a member of the Board and (v) was the
principal liaison with SEEAC;

(b)     Grote had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth
because as set forth in ¶¶ 25, 38-40 and 70-73, he (i) was involved in the
Alaska Derivative Action, (ii) is employed at Exploration and Production,
which oversees drilling at the Gulf, (iii) is Chief Financial Officer of BP
plc and (iv) member of the Board, to which SEEAC reports;

(c)     Inglis had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth
because as set forth in ¶¶ 26, 38-40 and 42, he (i) is Chief Executive of
Exploration and Production, which oversees drilling at the Gulf, and (ii)
participates and reports to SEEAC;

(d)     Svanberg had actual knowledge of the misrepresentations and omissions
of material facts set forth herein, or acted with reckless disregard for the
truth because as set forth in ¶¶ 27 and 38-40, he is the Chairman of the
Board and SEEAC reports to the Board;

(e)     McKay had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth
because as set forth in ¶ 32, he (i) is Chairman and President of BP
America, (ii) is a member of BP executive team, and (iii) overseas the
operations of BP in the United States including drilling in the Gulf; and

(f)     The SEEAC Defendants had actual knowledge of the misrepresentations
and omissions of material facts set forth herein, or acted with reckless
disregard for the truth because as set forth in ¶¶ 28-31, 33-35, 28-46 and
70-73, they are members of the SEEAC and/or have been involve in the
involved in the Alaska Derivative Action.

203.    As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market prices of BP shares and

ADRs were artificially inflated during the Class Period such that they did not reflect the true financial health and risk management and safety practices of BP as alleged in this Complaint.

204.    In ignorance of these facts, the market prices of the BP shares and ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which these securities trade, and/or on the absence of material adverse information that was known to or disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other Class members acquired BP shares and ADRs during the Class Period and were damaged thereby when the value of their shares fell after the truth became known, representing the casual connection between Defendants' fraud and Plaintiff's damages.

205.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BP shares and ADRs. Plaintiffs and the Class would not have purchased BP shares and ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

206.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of BP shares and ADRs during the Class Period in an amount to be determined at trial.

207.    By virtue of the foregoing, Defendants violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of § 20(a) of the 1934 Act against BP plc

208.    Plaintiffs repeat and reallege each of the allegations set forth in Count I.

209.   BP plc acted as a controlling person of BP America and BPX within the meaning of § 20 of the Exchange Act.

210.   BP plc incorporates the financial results of BP America and BPX into its own financial statements which it files with the SEC.

211.   BP plc, by virtue of its ownership of BP America and BPX, had the power to influence and control, and did influence and control, the misconduct of BP America and BPX about which Plaintiffs complain.

212.   BP America and BPX have overlapping directors and/or senior officers with BP plc.

213.   By reason of the foregoing, BP plc is liable pursuant to § 20(a) of the Exchange Act.

214.   As a direct and proximate result of BP plc's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of BP shares and ADRs during the Class Period in an amount to be determined at trial.

## COUNT III

### For Violations of § 20(a) of the 1934 Act
### against the Director Defendants

215.   Plaintiff repeats and realleges each of the allegations set forth in Count I.

216.   The Directors Defendants acted as controlling persons of BP plc within the meaning of § 20(a) of the Exchange Act as alleged in this Complaint.

217.   By virtue of their high-level positions as officers and/or directors of BP, and active participation in and/or awareness of the BP's day-to-day operations, and/or intimate knowledge of the BP's business plans and implementation thereof, each Director Defendant had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the BP, including the content and dissemination of the various statements that Plaintiffs allege are false and misleading.

218.    By reason of their positions in BP, the Director Defendants were provided with, or had unlimited access to, internal BP documents, reports and other information regarding the implementation of BP's risk management and safety procedures of its oil exploration and production operations, including those that related to offshore deep water drilling and the BP Disaster, and attended management, Board and/or SEEAC meetings.

219.    The Director Defendants were responsible for the truthfulness of the statements alleged in this Complaint to be misleading and/or shortly after these statements were issued had the ability to prevent the issuance of the statements or cause the statements to be corrected.

220.    The Director Defendants had direct and supervisory involvement in and knowledge of the day-to-day operations of BP and, therefore, had the power to control or influence the implementation of BP's risk management and safety procedures of its oil exploration and production operations, including those that related to offshore deep water drilling and the BP Disaster and giving rise to the securities violations as alleged herein, and exercised the same.

221.    By virtue of their positions as controlling persons, the Director Defendants are liable pursuant to § 20(a) of the Exchange Act.

222.    As a direct and proximate result of the wrongful conduct of the Director Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of BP shares and ADRs during the Class Period in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on their own behalf and on behalf of the Class prays for judgment as follows:

(a)      Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class;

(b)      Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)      Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)      Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 8, 2010

THE LAW OFFICES OF ERIC J. O'BELL, LLC

By: _____
Eric J. O'Bell (LA. BAR No. 26693)
3500 North Hullen
Metarie, Louisiana 70002
Tel.: (504) 456-8677
Fax: (504) 456-8624
*Attorneys for Plaintiffs*

ZWERLING, SCHACHTER
& ZWERLING, LLP
Robert S. Schachter
Richard A. Speirs
Stephen J. Riegel
Ana M. Cabassa
Shaye J. Fuchs

41 Madison Avenue
New York, NY  10010
Tel.:  (212) 223-3900
Fax:  (212) 371-5969
*Attorneys for Plaintiffs*


**DAVID M. FOSTER, P.C.**
David M. Foster
30833 Northwestern Highway, Suite 209
Farmington Hills, MI 48334
Tel: (248) 855-0940
Fax: (248) 855-0987
*Attorneys for Plaintiff Alan R. Higgs*

## LORE GREENFIELD CERTIFICATION

I, Lore Greenfield, declare that:

1.    I have reviewed the attached complaint and authorized its filing.

2.    I did not purchase or acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this action during the class period are as follows:

### TRANSACTIONS

| BUY | TRADE DATE | PRICE | TOTAL |
|---|---|---|---|
| 100 BP p.l.c. ADR | 3/11/2010 | $56.50 | $5,650.00 |

5.    During the three years preceding the date of this certification, I have not sought to serve or served as a representative party on behalf of a class.

6.    I will not accept any payment for serving as a representative party on behalf of a class, except to receive my *pro rata* share of any recovery or as ordered or approved by the court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Lore Greenfield, declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 7, 2010

_____
Lore Greenfield

## ALAN R. HIGGS CERTIFICATION

I, Alan R. Higgs, declare that:

1.      I have reviewed the attached complaint and authorized its filing.

2.      I did not purchase or acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this action during the class period are as follows:

### TRANSACTIONS

| BUY | TRADE DATE | PRICE | TOTAL |
|---|---|---|---|
| 100 BP p.l.c. ADR | 2/17/2009 | $44.24 | $4,424 |
| 100 BP p.l.c. ADR | 6/19/2009 | $49.30 | $4,930 |
| 100 BP p.l.c. ADR | 7/13/2009 | $44.75 | $4,475 |
| 100 BP p.l.c. ADR | 2/03/2010 | $56.25 | $5,625 |
| 200 BP p.l.c. ADR | 4/30/2010 | $56.25 | $11,250 |
| 150 BP p.l.c. ADR | 6/01/2010 | $37.50 | $5,625 |
| 150 BP p.l.c. ADR | 6/01/2010 | $37.05 | $5,557.50 |

5.      During the three years preceding the date of this certification, I have not sought to serve or served as a representative party on behalf of a class.

6:      I will not accept any payment for serving as a representative party on behalf of a class, except to receive my *pro rata* share of any recovery or as ordered or approved by the court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Alan R. Higgs, declare under penalty of perjury that the foregoing is true and correct.

Dated:  Darien, Connecticut
        June  8  , 2010

Alan R. Higgs

2